[Crim. No. 11483.   Second Dist., Div. Two.   Mar. 21, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES JOHNSON, JR., Defendant and Appellant.

H. George Taylor, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, P. J.—We have previously filed an unpublished opinion affirming a judgment convicting appellant of second degree murder and assault with a deadly weapon. ■ Appellant's petition for hearing in the Supreme Court was granted and its order retransferring the case to this court requires consideration of appellant's "contention that the prosecutor was guilty of improper conduct when, in three instances, he failed to offer proof of facts he asserted in cross-examining defendant, which assertions defendant denied."

■ Concededly it is improper to ask questions which clearly suggest the existence of facts in the absence of a good faith belief that the question would be answered in the affirmative, or a belief that the facts could be proved, and a purpose to prove them, if their existence be denied. (*People* v. *Lo Cigno*, 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354].)

■ The "three instances" referred to follow:

INCIDENT ONE—Knife fight on February 10, 1965.

"Q. You were cut in the leg or sustained this injury to your thigh on the 10th of February; isn't that right? A. That is true. Q. You told the people at St. Mary's a bumper jack slipped out from under the car and got you? A. That is right. Q. You didn't tell any police that you had been attacked, did you? A. No. That is why I told them that, because they was asking questions. Q. Did you have a knife on you at the time you say you got stabbed in the leg on the 10th? A. No, I did not. Q. Who stabbed you in the leg? A. I don't know. Q. Was anybody with you that you knew? A. No, there wasn't nobody with me. Just myself, going home. Q. Where did this happen? A. This happened over on Rhea. Q. Near your house? A. That is right. Q. The guys just walked up to you— A. No, I was the one walking, and they was in a crowd. Q. What happened between you and them to cause them to stab—this one guy or whoever it was, to stab you in the leg? A. I went to walk past a crowd, and as I got about five feet, they said, 'There go

that Compton so and so.' Q. Well, I take it, then you were really afraid of anybody from Long Beach and wouldn't want to be alone with them; is that right? A. At points. Q. But you and your brother were along with a bunch of Long Beach boys over in that alley behind 17th street, weren't you? A. Yes. You have got to make friends sometime. Q. You weren't afraid then were you? A. Yes. Q. Did you ever see the guy that cut you there on the 10th of February? Did you ever see him again? A. No I never seen him again. You said February the 10th? Q. Yes. A. No, I never seen him—I never seen him in the first place to see him again. I thought you was talking about in October. Q. No I am talking about the 10th of February. Maybe you are a little bit confused. On the 10th of February, you pulled a knife on some guy and had a knife fight with him? A. On the 10th of February? Q. Yes. A. No that is not right. Q. And you got cut in the thigh? A. No that is not right. Where did you hear this?''

Incident Two—Beating up a liquor store clerk.

''Q. Now, on the 25th of October 1964 you were with your brother Hubie— A. Hubert. Q. Excuse me Hubert and Haywood Thomas, James Collins and Jerry Williams; isn't that right? A. That is true. Q. How long had you been with them before you got the stab wounds in your stomach? A. Not very long a matter of minutes. Before I got what, now? Q. Before you got stabbed in the stomach. How long had you been with them? A. Oh, about twenty minutes. Q. As a matter of fact, you all had just gotten through beating up a liquor store clerk; isn't that right? A. No, that is not ture. Q. Were you ever, that night, just before you got stabbed, were you ever in Whistler's Liquor Store at 1012 East Pacific Coast Highway? A. I was not. Q. Were you with your brother Hubie for about an hour prior to your getting stabbed? A. No, I was not. I was at home. They picked me up a few minutes before this, before I got cut.''

Incident Three—Calling Jerry Williams a nigger.

''Q. Isn't it true that you called Jerry Williams a nigger and you and him got out of the car in the alley to have it out with each other with knives? A. That is not true, and what you are saying is an old saying. And I wouldn't call nobody that, and in fact, that wouldn't be nothing like no fight we was in, in the first place. That is baby stuff. Q. You and Jerry got out to have it out with knives in the alley? A. I did not have no knife, and I didn't know he had no knife. And when I actually knew he had a knife, I was cut. Q. As a matter of

fact, just after this fight, you were arrested; isn't that right? Just answer yes or no. A. No, I was not arrested. I was tooken to the Harbor General Hospital. Q. You were put in the prison ward; isn't that right? A. That is when I got to the Los Angeles General. When I woke up I had a chain around my leg, and it stayed around there for 21 days. I didn't see no detectives or nobody, and they put—dropped the chain and they put another charge—

"My name is James Johnson, and it is very common. And it could get mixed up. Q. You never testified against Mr. Williams, did you? Answer yes or no. A. No. Q. As a matter of fact, you never even made a police report; isn't that right? A. No, because I didn't know the guy's name. I mean, the police questioned me and I told them I didn't know his name. Q. Would you know him by name of Jerry Hyers, Williams? A. I wouldn't know his name, period. I would just know him if I see him.''

In *Lo Cigno, supra,* the assertive fact cross-examination was on vital and decisive evidence intrinsically connected with the actual perpetration of the murder which was charged. There was no objection to the questions in *Lo Cigno, as there was none at bench. A motion to strike was made in Lo Cigno.* None was made at bench.

In respect of the motion to strike in *Lo Cigno* this court was compelled to say at page 377 :

"If there had been any doubt as to the devastating effect of the question upon defendant's case, it was removed by the statements which the court made to the jury. The question itself implied that the deputies knew, or had been reliably informed, that Cohen did make the statement "Now, Sam, now.' The court's statement to the jury that after an investigation the court had found that the question was asked in good faith was an affirmation that the court had ascertained that the deputy had been reliably informed and believed that Cohen made the statement; and the court magnified the harm, immeasurably, by its amazing statement that the question was asked by the deputy in good faith *'but that because of circumstances beyond their control they are unable at this time to follow through.'* This was to tell the jury that there was at least one witness who heard Cohen make the remark, but that the district attorney, through no fault of his own was unable to produce the witness.''

Further in *Lo Cigno,* the situation was not even then allowed to rest. Commenting on the prosecution argument to the jury this court said at pages 376 and 377 :

"Not content to let the matter rest, Mr. Busch, at the inception of his closing argument, revived it, saying: 'They talk about Sammy here. They have talked about Jack O'Hara. Now, I am going to talk to you a little bit and answer these arguments because they have impugned my integrity in this case, too. *I have been in this position for eight years, and I defy anybody to show where any time I have prosecuted a case that I have ever acted in bad faith.*'

"There had been no charge of bad faith of other than the one in connection with the questioning of Cohen. The protestation of good faith to the jury in the argument necessarily related to that matter, and recalled to the minds of the jurors the court's announced finding that the deputies had acted in good faith but had been unable to prove that Cohen made the remark. The court's remarks on the subject constituted a gratuitous vindication and endorsement of the improper questioning by the prosecutors. No less improper was the self-praise of the prosecutor, in which he again told the jury that he had good reason for the questions he had asked."

Nothing approaching the flagrant situation in *Lo Cigno* exists in the case at bench. ▇ The general rule is that failure to object at trial precludes raising the issue for the first time on appeal except (1) ". . . where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, . . ."; (2) ". . . where the act is done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court." (*People* v. *Perez*, 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].)

▇ Numerous opinions which have explored similar prosecutorial misconduct despite the failure to object have invariably found that the cases were not closely balanced and the errors could have been cured by prompt defense action in the trial court. (See for example: *People* v. *Vasquez*, 224 Cal. App.2d 206, 211 [36 Cal.Rptr. 337]; *People* v. *Roberts*, 213 Cal.App.2d 387, 397-398 [28 Cal.Rptr. 839]; *People* v. *Lugo*, 220 Cal.App.2d 54, 61 [33 Cal.Rptr. 572].) (See also *People* v. *Miller*, 211 Cal.App.2d 569, 576-577 [27 Cal.Rptr. 290]; *People* v. *Swayze*, 220 Cal.App.2d 476, 497-500 [34 Cal.Rptr. 5].)

Clearly, the evidence at bench is not "closely balanced." In addition to abundant facts stated in our previous opinion, the record also discloses that Esther Hanna, a defense witness, testified the first time appellant went out of the house he was

the only one who exhibited a knife, and at that time he said he would cut up anybody who messed with him or his brother. She also testified that the second time appellant went out (just prior to the murder) he was the only one who had a knife and she did not see anybody holding a bumper jack. Thelma Swanigan, also a defense witness, testified that prior to the stabbing of the murder victim she did not see anybody with a bumper jack or a knife. Reuben Powell, a defense witness, testified that before anyone was cut nobody was trying to get or to hurt appellant.

The record also discloses a sufficiently strong basis for the prosecutor's assertive questions to cause us to conclude that he acted in good faith, and that the failure to object could have been calculated strategy on the part of the defense. If objection had been made the prosecutor would have been forced to produce the asserted evidence in which event greater harm would have occurred to appellant or if proof had been deficient, defense request for a prompt and full curative instruction would have obviated any improper effect of the assertive questions.

It will be noted that appellant first admitted and then denied the knife fight on February 10, 1965. He also denied he had been cut in the thigh. However, Dr. Attalla, a defense witness, testified that he examined appellant in the county jail on March 3, 1965 and observed an inflamed stab wound in his thigh which had occurred about two and a half weeks previously. Hospital records indicated the wound occurred allegedly as the result of an altercation and was treated at Harbor General Hospital on February 10, 1965.

As to incident two, beating up the liquor store clerk, the record, while not as clear, nevertheless tends to support the good faith of the prosecutor. Since appellant desired immediate sentence and waived any pre-sentence probation report, we do not have that document to aid us. However, the remarks of counsel relating to imposition of sentence go into this instance at some length.

The prosecutor, requesting consecutive sentences, represented to the court that there were facts he was positive would have been in a pre-sentencing report had one been prepared. He then described numerous incidents involving violence by appellant, including the following: "On October 25, 1964, the defendant and his brother went to a liquor store on the corner of California and Pacific Coast Highway. The liquor store clerk refused to sell some liquor to the minor brother. The

defendant and his brother then attacked the owner with a bottle, hitting him over the head with a bottle of liquor and attacking him with a claw hammer, causing him to go to the hospital.

"It is just about fifteen minutes before the defendant got into the knife fight in which he and a person by the name of Harris went out in the alley near the defendant's house to have it out with knives. He sustained very serious injuries.

"In regard to the attack on the liquor store owner, we did not file it because it was our impression at that time that the defendant was going to die.

"With regard to filing on the defendant for the mutual combat between him and Mr. Harris, we did not file, based on the fact there was mutual combat, and also shortly after the attack or the fight between the defendant and Mr. Harris, Mr. Harris was involved in a murder of a person by the name of Cosdrove and he is now in State Prison. . . ."

In response to the prosecutor's argument for consecutive sentences, defense counsel said:

"MR. OLSEN: Your Honor, I would have been inclined on the face of it to give credence to what counsel has said simply because he has represented this to be true, but for his reference to the incident involving the liquor store on October 25, 1964. Now, I happen to know, your Honor, also from personal knowledge, about that incident at Whisler's Liquor Store, because we are representing some other people . . . in that case. Counsel, of course, is simply relying on a typical police report, all of which is hearsay as to the various incidents, because that is what he is relying on in respect to the incident at Whisler's Liquor Store. It isn't true that the reason he was not filed on was because he was in the hospital and about to die. It was because he was not there. If they could have proved that the defendant was there, he would have been charged. Because as was indicated by the evidence here, he laid in the hospital with the chain around his leg for twenty-one days while they tried to develop the evidence to charge him. They [sic] they discovered that they didn't have the evidence and he walked out of the hospital a free man because they could not prove it. The reason that they could not prove is because he just was not there. I am making this representation to the Court on the basis of statements that were made by two of the other people who were there, as I recall, and I would ask the Court to indulge me in my recollection and the possibility that my recollection in this regard might be faulty,

but I did read the transcript of the preliminary hearing in that case. My recollection of that transcript as to the identification of people by the several witnesses— this wasn't a one-clerk situation, there were three different people in the liquor store at the time in an employment capacity, one of whom allegedly was attacked. There were three witnesses in the store who reported to the police. None of those people ever identified this defendant and that is why I suggest that if the District Attorney is in error on that point, because of hearsay, as to the nature of it, he very easily is in error as to all the rest of it.''

Both counsels' strong views with respect to incident two buttress our belief that defense counsel's failure to object to the assertive remarks was purely tactical and that the prosecutor acted in good faith. No straining is required to assume that defense counsel was familiar with the rule in this connection, and knew that if objection had been made, the prosecutor was probably in a position to prove most of the assertions in the questions or they could have been deleted by the court's instructions at the time for the jury's consideration without any harmful effect. A demonstration of this procedure is furnished when during cross-examination of appellant's brother Billy Clarence (before appellant took the stand) there was an objection to certain impeaching questions ''. . . unless counsel is prepared to show, by offer of proof, that he is in position to impeach this witness by competent testimony.''

With respect to incident three, calling Jerry Williams a nigger, appellant admitted he had been knifed and hospitalized but denied he was arrested, yet he testified he was chained in the hospital prison ward for 21 days at which time ''they put another charge'' on him. Appellant contends that the judgment should be reduced to voluntary manslaughter. We repeat the language of our previous opinion:

''Appellant contends the evidence supports only a verdict of voluntary manslaughter and not second degree murder. As defined in Penal Code, § 187: 'Murder is the unlawful killing of a human being, with malice aforethought.' Section 188 defines malice, both expressed and implied: 'It is expressed when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. *It is implied, when no considerable provocation appears,* or when the circumstances attending the killing show an abandoned and malignant heart.' (Emphasis added.)

"The crux of appellant's argument is that malice cannot be implied in the instant case because the killing was done under circumstances of 'justification, excuse, or mitigation,' and in the 'heat of passion.' As pointed out in *People* v. *Valentine,* 28 Cal.2d 121, 144 [169 P.2d 1], the question of the existence of the above circumstances is 'one of fact for the jury under proper instructions.' Appellant, ignoring considerable prosecution evidence and drawing on the evidence most favorable to his position, argues that 'the only reasonable interpretation' shows the killing was the product of the heat of passion.

"The prosecution evidence indicates, however, that more than an hour before the killing appellant brandished two knives and said one was to kill a 'mother fucker' with. He later said anyone who 'messed' with him or Billy would be killed. Assuming appellant might have been justified in using deadly force to protect himself or his brother, the evidence supports the jury's apparent conclusion that no one was threatening appellant with a bumper jack or in any other way at the time of the stabbing, and Billy was not even then on the scene.

"Concededly, it is difficult to formulate an all-inclusive or comprehensive definition of malice aforethought and the circumstances which justify a finding whether or not it existed. (See *People* v. *Gorshen,* 51 Cal.2d 716, 730, especially fn. 11 [336 P.2d 492].) Appellant, however, has pointed to no more than conflicts in evidence which the jury resolved against him, which evidence undoubtedly supports a verdict of murder. (*People* v. *Dewberry,* 51 Cal.2d 548, 553 [334 P.2d 852], and cases cited therein.)"

The evidence of guilt of second degree murder and assault with a deadly weapon is substantial. If under the circumstances here detailed the assertive cross-examination was error, we are convinced beyond a reasonable doubt it was harmless in its effect on the jury in respect of whether the crime was second degree murder or voluntary manslaughter (*People* v. *Otwell* *(Cal.App.) 61 Cal.Rptr. 427). No miscarriage of justice has resulted either under the federal standard (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]) or the state standard (Calif. Const., art. VI, § 13, and *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243].)

---

*A hearing was granted by the Supreme Court on October 11, 1967, and the cause was retransferred to the Court of Appeal, Third District, with directions. A subsequent Court of Appeal opinion and order were certified for nonpublication.

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 15, 1968.