Filed 6/1/16  P. v. McCarty CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C073563 |
| v. | (Super. Ct. No. CM035018) |
| CHRISTOPHER JAMES McCARTY, | |
| Defendant and Appellant. | |

Defendant Christopher James McCarty shot his father, Michael McCarty, in the head with a rifle, causing instantaneous death.[1]  He was convicted by jury of first degree murder and found to have personally and intentionally discharged a firearm causing great bodily injury or death.  The trial court sentenced defendant to serve an indeterminate term of 50 years to life in state prison and imposed other orders.

---

[1]     To avoid confusion, we refer to defendant's family members by their first names or by their relation to defendant.

1

On appeal, defendant contends: (1) his trial counsel provided constitutionally deficient assistance by failing to object to testimony that defendant did not deny certain statements made by a detective to defendant, purportedly while he was being transported to the sheriff's office and before he was advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*); (2) the trial court prejudicially erred and violated defendant's constitutional rights by preventing defense counsel from asking defendant's brother, Daniel, whether he was the one who shot their father; (3) the trial court prejudicially erred and further violated defendant's constitutional rights by admitting certain out-of-court statements, made two days before the murder, indicating defendant was behaving strangely, he was not taking his medication, and the declarant was afraid he would hurt himself or someone else; (4) the trial court also prejudicially erred by overruling various objections to testimony elicited from the medical examiner; and (5) the cumulative prejudice flowing from the foregoing assertions of error requires reversal.

We affirm. As we explain, defendant has not carried his burden with respect to the ineffective assistance claim raised in his opening brief, and we decline to consider a new argument related to this claim that was raised for the first time in his reply brief. The trial court neither erred nor violated defendant's constitutional rights by preventing the defense from asking Daniel whether he shot Michael because there was no direct or circumstantial evidence linking Daniel to the murder. We do agree with defendant that hearsay statements indicating he was acting strangely, he was not taking his medication, and the declarant was afraid he might hurt himself or someone else were improperly admitted, but conclude the error was harmless. Assuming certain testimony from the medical examiner was also improperly admitted, we conclude this assumed error was also harmless. Finally, assessing the cumulative prejudice flowing from these actual and assumed errors, we conclude reversal is not required.

FACTS

Because we conclude certain evidence was improperly admitted and assume other evidence was also improperly admitted, and must therefore assess the prejudicial effect of these actual and assumed errors, we recite the facts in some detail based solely on evidence we conclude was properly admitted. As always, we do so in the light most favorable to the judgment.

In August 2011, defendant and his brother, Daniel, lived with their father, Michael, in Magalia, a small community east of Chico. Their mother, Patricia, lived in a trailer park a few miles away. She and Michael were divorced. Defendant and Daniel also had a sister, Sarah, and nephew, Tyler, who sometimes stayed over at Michael's house.

The morning of the murder, the only people at the house were Michael, defendant, Daniel, and Tyler, who was six years old and sleeping on the couch when Daniel got up and went outside to clean his truck. At some point that morning, Patricia called the house to tell Michael she needed to borrow one of the family's trucks. According to Patricia's testimony, while she was on the phone with Michael, she heard him say to someone: "What are you doing? Where are you going with that?" Patricia claimed not to know to whom Michael was speaking and denied overhearing an argument while she was on the phone. However, after the murder, Patricia told a friend, Amber Stromsoe, that Michael and defendant were arguing about defendant wanting to take a vehicle. She also told Daniel's girlfriend's mother, Tanya Nogales, that Michael and defendant were arguing about "a gun or keys or both." During the phone call, the line went dead. Patricia immediately called back, but no one answered. When she called a third time, Daniel answered. While he was outside vacuuming his truck, he had a cordless house phone near him and heard it ringing when he stopped the vacuum. Patricia told Daniel she was

3

talking to Michael but was disconnected, so Daniel went inside the house to give the phone to his father.

Meanwhile, Tyler awoke to a "loud noise" and was immediately greeted by defendant, who came from the hallway and was holding a rifle. Defendant took Tyler outside the house, telling him: "Don't go back in there." He then put the rifle in the back of his father's SUV. The loud noise Tyler heard was the discharge of the rifle, a Browning semi-automatic hunting rifle chambered to fire a .300 Winchester Magnum rifle cartridge, a "fairly high-powered cartridge." The rifle was fired from the hallway, at a distance no closer than about two feet from where Michael was standing in the doorway to his master bedroom. The round that was fired entered Michael's skull near his right eye at a speed of roughly 3,000 feet per second, introducing a massive pressure wave that "exploded" his skull, sending blood, bone fragments, and brain tissue throughout the room. While the bullet did not hit the cordless phone Michael was holding to his face when he was shot, the force of the skull explosion also broke the phone into pieces, disconnecting the call before Patricia could hear the rifle's report. Michael's body collapsed, coming to rest partly in the bedroom and partly in the hallway.

As mentioned, defendant immediately took Tyler outside. Daniel, after answering the phone call from Patricia, passed defendant and Tyler on his way into the house to give the phone to Michael. Finding his father's body on the floor in the condition previously described, Daniel became "hysterical." He did not remember talking to his mother on the phone again, but remembered going outside and asking defendant: "What happened?" According to Patricia, Daniel told her, "something happened to Dad," prompting her to immediately go to her neighbor Stromsoe's trailer and ask for a ride over to the house. Stromsoe testified Patricia "came pounding on [her] door" and said she needed a ride to her ex-husband's house because he and defendant were arguing

4

when "the phone scuffled and disconnected"; Patricia was "hysterical" and "very worried that they were arguing, and needed to get there."

When Patricia and Stromsoe got to the house, defendant, Daniel, and Tyler were outside. Daniel and Tyler were in front of the house, while defendant was standing by himself, off to the side of the house. Stromsoe described defendant's demeanor as "emotionless." Nogales and her daughter, Daniel's girlfriend, also came over to the house. Apparently, Daniel had called Nogales's daughter and asked her to come get Tyler. Nogales also described defendant's demeanor as "very blank," whereas Daniel was "very irate and screaming his dad was dead." At some point, Daniel grabbed defendant and yelled: "What did you do? What happened to Dad?" A neighbor, who had also come over to the house, pulled Daniel off of his brother. Defendant said nothing in response to this implied accusation. According to Stromsoe, defendant "didn't say anything from the time [she] arrived until the police came. He was -- there was no response, no emotion." Patricia confirmed defendant did not say anything, even when she tried to talk to him.[2]

Stromsoe called 911 after arriving at the house. Sheriff's deputies arrived a short time later. Defendant was again standing "[o]ff to the side," away from the others who were standing in a circular formation in front of the house. He was wearing a green jacket that was removed during a pat-down search for weapons and placed on a fence next to where defendant was standing. Another deputy spoke to defendant, who directed the deputy to the rifle and admitted he placed the rifle in his father's SUV. The rifle was loaded, but the safety was on. Another deputy made the rifle "safe" by clearing the

---

[2] Patricia also testified defendant had been "very quiet" in the weeks leading up to the murder and would "disappear" for four or five days at a time, which was "not like" her son. She attributed defendant's behavioral change to him not taking certain unspecified medication that had been prescribed to him by a doctor.

chamber of one unfired .300 Winchester Magnum cartridge and removing the rifle's magazine that had a three-cartridge capacity, but contained only two cartridges. The rifle, magazine, and unfired cartridges were collected as evidence. An expended cartridge of the same caliber was found on the floor in the hallway next to Michael's body and was also collected as evidence. Subsequent testing confirmed this cartridge was fired by the rifle recovered from the SUV. Ten latent fingerprints were lifted from the rifle and magazine. Eight of the fingerprints matched defendant; while the other two were unsuitable for identification, the fingerprint analyst was able to exclude Michael, but not defendant, as the source of the prints. Deputies searched defendant's bedroom and found a box of .300 Winchester Magnum cartridges in a bag under a couch in the room. The family's motor home was also searched. On the bed in the motor home was a green backpack and an open rifle case that was empty. Mail addressed to defendant was found on a counter in the motor home. The green jacket was also collected as evidence due to the presence of what appeared to be blood stains, three of which were tested and confirmed to be blood. Subsequent DNA testing revealed Michael's DNA profile matched that of the blood on the jacket.

Defendant was taken into custody and transported to the Butte County Sheriff's Office in Oroville, where he was interviewed by Detective Chris Nicodemus. The details of the ride and subsequent interview are the subject of defendant's first contention on appeal and will be discussed in greater detail when we address that issue below.

Statements defendant made during four jailhouse visits were also admitted into evidence. We discuss statements made during one of these visits in greater detail in the discussion portion of this opinion. For present purposes, it will suffice to note that during a visit from Daniel, Daniel told defendant he told someone, presumably from the District Attorney's office, he and defendant "both got hit with the bat" and defendant "never got to go to the hospital" to "get medicine for [his] damaged brain." Defendant responded,

6

"that had nothing to do with that day." Defendant then admitted he was in the motor home the morning of the murder. During another visit, after an unidentified visitor suggested defendant claim temporary insanity, defendant said he did not remember anything that happened except "walking in and seeing [his father] on the floor," to which the visitor replied: "Okay. Good boy." During a third visit, the unidentified visitor told defendant, "I've been praying for you," to which defendant responded: "The devil just got a hold of me, I guess, you know, everywhere I go I was hearing voices . . . ." During the final visit, the unidentified visitor told defendant he needed "to think about . . . getting [himself] fixed," to which defendant replied: "Well, if everyone would have been taking care of themselves and let me do what I needed to a long time ago, then I wouldn't be here and this all wouldn't have happened . . . ."

DISCUSSION

I

*Ineffective Assistance of Counsel*

Defendant contends his trial counsel provided constitutionally deficient assistance by failing to object to testimony that defendant did not deny certain statements made by Detective Nicodemus, purportedly while defendant was being transported to the sheriff's office and before he was advised of his *Miranda* rights. As we explain, this contention is premised on an erroneous reading of the record. Properly understood, the record does not support the ineffective assistance claim raised in defendant's opening brief. Anticipating this conclusion, for the first time in his reply brief, defendant makes a different argument, i.e., even if there was no *Miranda* violation, his trial counsel's failure to object still fell below an objective standard of reasonableness because the admission of evidence defendant did not deny certain statements made by the detective during the interrogation violated his right to due process under *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*). This new argument is forfeited.

7

## A.

### *Additional Background*

As the Attorney General points out, the record does not support the view defendant was questioned during the drive to the sheriff's office. Rather, he was questioned at the sheriff's office after receiving the required *Miranda* warnings and agreeing to speak to Detective Nicodemus.

With respect to the content of the interrogation, Detective Nicodemus testified he "explained to [defendant] that there were three people in the home: A decedent, a six-year-old, and himself. The decedent did not kill himself and the six-year-old did not do that, leaving one person." The prosecutor then asked: "Did he deny any of that?" The detective responded: "No."

Defense counsel did not object to this testimony on either *Miranda* or *Doyle* grounds.

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack

thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendant has not carried his burden. For obvious reasons, an objection under *Miranda* would have been properly overruled. As mentioned, defendant was questioned at the sheriff's office after receiving the required *Miranda* warnings and agreeing to speak to Detective Nicodemus. Thus, defense counsel was not ineffective for failing to make such a futile objection. (*People v. Linton* (2013) 56 Cal.4th 1146, 1168 ["Because there appears to have been no sound basis for counsel to have objected to the admission of defendant's bedroom statements on the grounds of a *Miranda* violation, no deficient performance by counsel has been established"]; see also *People v. Lewis* (2001) 26 Cal.4th 334, 359 ["Where 'there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance'"].) This conclusion disposes of the claim raised in defendant's opening brief.

However, for the first time in his reply brief, defendant argues, even if there was no *Miranda* violation, his trial counsel was still ineffective in failing to object. This is so, he argues, because "[d]ue process principles of fundamental fairness prohibit using post-arrest, post-*Miranda* warning silence in the face of accusations leveled by agents of the state because the warnings implicitly promise the prosecution will not do so." We must first determine whether this argument is cognizable on appeal.

"As a general proposition, points raised for the first time in a reply brief will not be considered unless good reason is shown for failure to present them earlier." (*People v.*

*Whitney* (2005) 129 Cal.App.4th 1287, 1298; *People v. Failla* (2006) 140 Cal.App.4th 1514, 1519, fn. 3.) "'Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission. Hence, the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. [Citations.]' [Citation.]" (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2.)

Defendant has advanced no good reason for withholding this argument until the reply brief. The argument is therefore forfeited.

Defendant may object that he did raise the argument in the opening brief, i.e., by making reference to the prosecutor "exploit[ing] the evidence in his summation by pointedly characterizing [defendant's] mere silence as an incriminating response: 'Then another officer talks to him and says, "Well, there was only Tyler in there with your father and you. And that wasn't suicide, and Tyler didn't do it." And [defendant] didn't deny that. If he didn't do it, there's no way in the world that he wouldn't have told that officer, "No, you're wrong. I didn't do it."' [Citation.] Such argument placed the onus squarely on [defendant] to speak up and refute the accusation even though he was entitled to say nothing at that point." However, this reference to the prosecutor's use of defendant's post-*Miranda* warning silence was made under the subheading, "Prejudice," of the main heading: "APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE REPRESENTATION BY FAILING TO OBJECT *ON FIFTH AMENDMENT GROUNDS* TO EVIDENCE OF APPELLANT'S ADOPTIVE ADMISSION OF GUILT MADE DURING THE DRIVE TO THE STATION SINCE THE OFFICER SHOULD HAVE KNOWN HIS STATEMENT WAS REASONABLY LIKELY TO ELICIT AN INCRIMINATING RESPONSE." (Italics added.) The arguments presented prior to the

above-quoted reference to the prosecutor's argument were directed solely at establishing a *Miranda* violation and ineffective assistance of counsel for failing to object on this ground, and were made under subheadings indicating they sought to establish such a violation and accompanying ineffective assistance. No argument preceding the "Prejudice" subheading sought to establish a due process violation under *Doyle*, *supra*, 426 U.S. 610. Nor did any heading or subheading announce such an argument was intended. Nor was *Doyle* cited at all in the opening brief. Rule 8.204 of the California Rules of Court requires that each brief "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)

And while defendant may further object he did cite *People v. Savala* (1970) 10 Cal.App.3d 958, a pre-*Doyle* case holding, "the silence of a suspect under arrest in reply to accusatory statements . . . is not admissible against him [or her] even after a previously effective waiver of his [or her] *Miranda* rights" (*id*. at p. 962), we cannot conclude the above-quoted reference to the prosecutor's argument, accompanied by citation to *Savala*, without any discussion of this case or any argument it provided a separate reason for concluding trial counsel's failure to object to the admission of the evidence fell below an objective standard of reasonableness, amounted to "reasoned argument . . . and discussion of legal authority" (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685), as is required to present a cognizable argument on appeal. And again, to the extent this reference and citation may be considered an "argument," it was not made under a separate heading or subheading, as is required by our Rules of Court. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Instead, it was made during defendant's discussion of prejudice allegedly flowing from the purported *Miranda* violation, under the subheading "Prejudice," virtually guaranteeing it would remain unaddressed by the Attorney General in the respondent's brief.

11

Accordingly, defendant's assertion of ineffective assistance of counsel based on failure to object to alleged *Doyle* error was not properly raised until the reply brief. (*Doyle, supra,* 426 U.S. 610.)  Because he has not advanced any good reason for failing to do so until then, we shall not address it.

<h1 style="text-align:center">II</h1>

<h3 style="text-align:center">*Ruling Preventing Third Party Culpability Evidence*</h3>

Defendant claims the trial court prejudicially erred and violated his constitutional rights by preventing defense counsel from asking Daniel on cross-examination whether he shot Michael.  We disagree.

In *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), our Supreme Court held third-party culpability evidence is admissible if the evidence is "capable of raising a reasonable doubt of defendant's guilt," clarifying that "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*Id.* at p. 833; see also *People v. Prince* (2007) 40 Cal.4th 1179, 1242; *People v. Panah* (2005) 35 Cal.4th 395, 481.) "[O]nce evidence of this type has been found relevant and admissible, the [trial] court may nonetheless exercise discretion under Evidence Code section 352 to exclude it where its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion."  (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136, citing *Hall*, *supra*, 41 Cal.3d at p. 834.)  "We review a trial court's rulings on the admission and exclusion of evidence for abuse of discretion.  [Citation.]"  (*People v. Chism* (2014) 58 Cal.4th 1266, 1291.)

Of course, if Daniel answered "yes" to the proposed question, that confession would have been capable of raising a reasonable doubt as to defendant's guilt.  However, there is another legal principle at play here:  "[I]t is improper to ask questions which

clearly suggest the existence of facts in the absence of a good faith belief that the question would be answered in the affirmative, or a belief that the facts could be proved, and a purpose to prove them, if their existence be denied." (*People v. Johnson* (1968) 260 Cal.App.2d 343, 344; see also *People v. Lomax* (2010) 49 Cal.4th 530, 580 ["trial court properly prevented counsel from asking questions that lacked a good faith basis and invited jury speculation on claims that would not be given any evidentiary support"].)

Here, defense counsel had no good faith basis to believe Daniel would have confessed to shooting his father. Prior to Daniel's testimony, defense counsel argued defendant's jailhouse conversation with Daniel provided such a basis. In that conversation, as mentioned previously, Daniel told defendant he told someone, presumably from the District Attorney's office, he and defendant "both got hit with the bat" and defendant "never got to go to the hospital" to "get medicine for [his] damaged brain." Defendant responded: "[Y]eah, that had nothing to do with that day." Daniel replied: "I thought that made you not yourself or something. I don't know, it's just all messed up. It's so sad, I just wanted you to get the care that you needed." Then, after an apparently omitted portion of the conversation, the transcript of the conversation picks up with Daniel saying to defendant: "[T]hey're pinning everything on you. I don't even know what happened. You just got Tyler out, and I don't know, I was out vacuuming my truck." Defendant responded: "I was outside with you, too, remember? I was cleaning my RV. I remember that. I saw you, you were right there. You were right there in the driveway and I was at my RV, cleaning my RV out. You were right there in front of the shop." Daniel replied: "That's what I don't understand, they're saying that you done it."

Based on this conversation, defense counsel argued to the trial court: "Daniel is clearly putting my client outside the house when it, it happened. Aside from Tyler, the minor; my client; and Daniel, we have no evidence of anyone else being there. And Daniel is saying that my client was outside the house. I think it's a fair inquiry to ask him

if he was inside the house when that shot was fired." The trial court responded: "Well, that's a different question than what was proposed. Do you have anything further?" Defense counsel indicated he had nothing beyond Daniel's statements purportedly placing defendant outside the house when the fatal shot was fired. The trial court denied defense counsel's request to ask Daniel whether he shot his father, but allowed him to question Daniel concerning his statements placing defendant outside with him.

We conclude the trial court did not abuse its discretion in so ruling. Even assuming Daniel's statements during the jailhouse visit can be read to place defendant outside the house *when the fatal shot was fired*, they also placed Daniel outside the house at this critical time. Therefore, they did not provide any good faith basis to believe Daniel would confess to shooting his father. Nor would Daniel's statements in the conversation, or any other evidence presented during the trial, provide defense counsel with a means of proving Daniel shot Michael in the event he denied doing so. Moreover, in light of the other evidence adduced during the trial, the jury was far more likely to interpret the conversation between defendant and Daniel to place defendant outside the house, in the motor home where the empty rifle case was recovered, *before the murder*, i.e., before removing the rifle from that case, entering the house with it, arguing with Michael while he was on the phone with Patricia, and then shooting Michael in the face with the rifle before removing Tyler from the house and placing the rifle in Michael's SUV. Thus, far from providing a good faith basis to attempt to elicit a confession from Daniel, the conversation provided additional circumstantial evidence of defendant's guilt in an already strong case.

Nevertheless, defendant argues Daniel's "presence as one of a very limited number of persons who could have possibly committed the crime" and his "conduct at the scene before police arrived," combined with the foregoing conversation, "supported reasonable inferences sufficiently linking him to the offense to have the capacity to raise

14

a reasonable doubt" as to defendant's guilt under *Hall*, *supra*, 41 Cal.3d 826. As a preliminary matter, these additional circumstances, now advanced to support the requested inquiry into whether Daniel shot Michael, were not presented to the trial court below. "[T]he proponent of evidence must identify the specific ground of admissibility at trial or forfeit that basis of admissibility on appeal." (*People v. Ervine* (2009) 47 Cal.4th 745, 783.) This is because "[a] party cannot argue the [trial] court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Because defendant did not ask the trial court to take these additional circumstances into consideration in determining whether to allow defense counsel to ask Daniel whether he shot Michael, he has forfeited the argument the trial court "failed to apprehend such circumstances permitted reasonable inferences capable of raising a reasonable doubt."

In any event, even considering the combination of the jailhouse conversation between Daniel and defendant, Daniel's presence at the scene of the crime, and his conduct before the arrival of sheriff's deputies, this evidence does not provide a good faith basis for defense counsel's proposed question. We have already concluded the jailhouse conversation does not supply any basis for believing Daniel shot Michael. Nor does his presence at the crime scene, "absent any evidence, direct or circumstantial, linking [him] to the crime . . . ." (*People v. Panah*, *supra*, 35 Cal.4th at p. 481.) Finally, Daniel's behavior following the murder is consistent with someone who found his father's deceased body and became "angry," "upset," and "hysterical" over the tragic and unexpected loss, whereas defendant, described by witnesses as being "emotionless" and "very blank," did not respond when Daniel grabbed him and yelled: "What did you do? What happened to Dad?" Thus, while defendant's behavior after the murder supplied circumstantial evidence of his culpability, the same cannot be said of Daniel's behavior. Nor are we persuaded by defendant's argument that "evildoers are often adept at

15

manipulating and exploiting the more predictable assumptions and conclusions people are apt to draw from such reactions." Indeed, this very argument tacitly admits Daniel's behavior was not consistent with his having murdered his father. The suggestion Daniel might be an "evildoer," pretending to be upset while manipulating defendant into incriminating behavior, is pure speculation and does not supply a good faith basis for asking Daniel whether he shot Michael.

The trial court did not abuse its discretion in preventing defense counsel from asking Daniel whether he shot Michael. Nor did this ruling violate any of defendant's federal constitutional rights. (See *People v. Prince*, *supra*, 40 Cal.4th at p. 1243 [rejecting claim the proper exclusion of third-party culpability evidence violated defendant's constitutional rights].)

### III

### *Admission of Hearsay*

Defendant also contends the trial court prejudicially erred and further violated his constitutional rights by admitting an out-of-court statement, made by Sarah two days before the murder, warning Stromsoe to keep her son away from the house if defendant was there because he "had been acting funny and had been off his meds" and Sarah was afraid he "[m]ight hurt somebody or himself." We agree the evidence was erroneously admitted, but conclude the error was harmless.

Subject to numerous exceptions, "hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) Such evidence is defined to mean "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (*Id*., subd. (a).)

Evidence Code section 1250 provides an exception for "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . ." In order for this exception to apply, the statement must not have been made under circumstances

16

indicating a "lack of trustworthiness" (Evid. Code, § 1252), and must be offered either "to prove the declarant's state of mind, emotion, or physical sensation," or "to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).) Thus, a prerequisite to this exception is that the declarant's mental state or conduct be placed in issue. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884; *People v. Noguera* (1992) 4 Cal.4th 599, 621.)

"In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, *is not hearsay*. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. [Citation.] Again, such evidence must be relevant to be admissible—the declarant's state of mind must be in issue. [Citation.]" (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389, italics added.)

Sarah's out-of-court statements to Stromsoe can be broken into four parts: (1) keep your son away from the house if defendant is home; (2) defendant has been acting funny; (3) defendant has not been taking his medication; and (4) I am afraid defendant might hurt himself or somebody else. The first statement is not hearsay at all. The fact Sarah warned Stromsoe to keep her son away from defendant is circumstantial evidence of Sarah's mental state, i.e., her fear defendant might harm Stromsoe's son. The second and third statements set forth the reason for that fear. If offered to prove the truth of the matters stated, i.e., defendant was acting strangely two days before the murder and was not taking his medication, these statements would be inadmissible hearsay. However, whether true or not, the fact these statements were made tends to circumstantially prove Sarah feared for the safety of Stromsoe's son. Finally, the fourth statement specifically declares Sarah's mental state, i.e., her fear defendant might hurt himself or someone else. Thus, the first three statements are potentially admissible as non-hearsay circumstantial

17

evidence of Sarah's state of mind, while the fourth statement is potentially admissible under the state of mind exception to the hearsay rule. Nevertheless, in order for these statements to be admissible either as circumstantial evidence of Sarah's state of mind or under the state of mind exception to the hearsay rule, Sarah's state of mind must be at issue in the case. (See *People v. Kovacich*, *supra*, 201 Cal.App.4th at pp. 884-889.) Under no conceivable theory of this case was Sarah's state of mind two days before the murder placed in issue.

Nor has the Attorney General provided any argument justifying admission of the challenged statements. She instead argues any assumed error was harmless. We agree. While circumstantial in nature, the case against defendant was incredibly strong. Patricia was on the phone with Michael when he was shot. While she denied Michael was arguing with defendant at the time, her prior inconsistent statements made to Stromsoe and Nogales, properly admitted for their truth, revealed Michael was arguing with defendant before the phone disconnected. The argument was about defendant taking a vehicle, or gun, or both. The phone was disconnected when a high-powered round fired from a hunting rifle entered Michael's skull at supersonic speed, exploding his skull and shattering the cordless phone as Michael held it to his face. The rifle's report woke up Tyler, who was sleeping on the couch in the living room. Defendant immediately emerged from the hallway and took Tyler outside. While Tyler denied defendant was holding a rifle when he did so, Tyler's prior inconsistent statement to one of the responding deputies, properly admitted for its truth, revealed defendant was holding a rifle when he took Tyler outside. Defendant himself admitted to placing the rifle in Michael's SUV after taking Tyler outside. Daniel testified he was outside vacuuming his truck when he stopped the vacuum and heard a nearby cordless phone ringing. After answering the call, which was Patricia calling back after being disconnected, Daniel walked past defendant and Tyler on his way into the house to give the phone to his father,

18

at which point he discovered Michael's deceased body partly in the hallway and partly in his bedroom. Michael's blood was found on defendant's jacket. Ballistics matched the shell casing found next to Michael's body to the rifle defendant placed in Michael's SUV. Defendant's fingerprints were found on the rifle. An empty rifle case was found in a motor home next to the house, along with a back pack and some of defendant's mail, and defendant admitted in a jailhouse conversation with Daniel that he was in this motor home that morning, which corroborates Patricia's out-of-court statements Michael and defendant were arguing about defendant wanting to take a vehicle and/or a gun. Defendant's behavior following the murder was also incriminating, as previously discussed. All of this provided a strong circumstantial case as to defendant's identity as the shooter.

Finally, as we describe in greater detail below, the medical examiner testified the end of the rifle's barrel was no closer than "a foot and a half" away from Michael when the fatal shot was fired, which estimate was based on the condition of the skin around the entrance wound. Also based on the condition of the entrance wound, the medical examiner testified the shot was fired "straight on," as opposed to at an angle. This evidence strongly negated any possibility the rifle was accidentally fired during a struggle for the weapon, and coupled with the evidence of the argument between defendant and Michael immediately before the shooting and defendant's post-shooting incriminatory conduct, strongly supported the jury's conclusion defendant killed his father deliberately and with premeditation.

In light of this strong circumstantial evidence of guilt, we conclude there is no reasonable probability the result would have been different had the challenged out-of-court statements been excluded. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 1015 [prejudicial effect of erroneous admission of hearsay assessed under harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836].) Moreover, even assuming

defendant is correct the admission of these statements also violated his confrontation rights because he had no opportunity to cross-examine Sarah, we also conclude based on the strength of the case against defendant the error was harmless beyond a reasonable doubt.  (See *People v. Noguera*, *supra*, 4 Cal.4th at p. 623.)

## IV

### *Admission of the Medical Examiner's Blood Spatter and Trajectory Testimony*

Defendant further asserts the trial court prejudicially erred by overruling various objections to blood spatter and trajectory testimony elicited from the medical examiner. Assuming the trial court erred in allowing this testimony, the error was harmless.

### A.

### *Additional Background*

The medical examiner, Dr. Thomas Resk, testified to being a physician and forensic pathologist with additional certifications in anatomic and clinical pathology.  Dr. Resk explained a "pathologist" is a doctor who studies the causes of disease.  A "forensic pathologist is . . . a pathologist who is specially trained in areas of wound interpretation and causes of death, timing of events related to death."  Dr. Resk also testified to having performed roughly 4,000 autopsies in his career, with "probably 97 percent" being forensic in nature.  Specifically referring to homicides, the doctor testified:  "I've done hundreds of homicides of everything varying from gunshot wounds to stabbings, to hatchet murders, to strangulation.  I've done many, many hundreds of gunshot wound cases."  In such cases, his role as the forensic pathologist is to examine the body and provide "not only a cause of death, but the manner of death, whether it be natural, accidental, suicide."

After describing his credentials and experience, Dr. Resk testified to the different characteristics of skull wounds created by an impact from a projectile traveling at a high velocity, as opposed to one traveling at a lower velocity.  Dr. Resk also testified

20

he examined Michael's body at the scene of the crime, examined Michael's bedroom for blood spattering, and also examined a bullet hole in the bedroom window. Based on the condition of Michael's skull, Dr. Resk opined a bullet traveling at supersonic speeds entered Michael's skull near his right eye, introducing a massive pressure wave into the skull that "basically exploded" his skull, ejecting the right portion of his brain into the bedroom behind him and sending blood throughout the room. The bullet then exited where the back of the skull would have been had it not been blown apart, resulting in the absence of an identifiable exit wound. The doctor also testified, without objection, the forces acting upon the body in such a case can cause blood and other bodily material to be "blown back" toward the direction of the gunshot, referred to as "back spatter."

It was at this point in the prosecutor's examination of Dr. Resk defense counsel objected to the following question as calling for an answer outside the doctor's scope of expertise. The prosecutor asked: "Well, can you tell anything about how far an item, say an item of clothing, was from [Michael's] head by the amount of back spatter that comes back in that direction and gets on that clothing?" After defense counsel's objection was overruled, Dr. Resk answered: "In part, I can tell that. One -- well, specifically for [Michael], I looked at the clothing to see if there was any material on his clothing certainly, as well as on everything forward, in front of him, and looked for that. But in terms of actually determining the distance, the -- one of the things that would be looked at, which I did not look at, would be the weapon, to see if there -- one, if a weapon is available, if a weapon is there, and confiscated to look at the weapon itself, and see if there's any material on that -- blood, tissue -- see if there's any blood or tissue within the muzzle of the weapon itself. And I did not do that at the scene."

The prosecutor then asked Dr. Resk to assume "the rifle was recovered and did not appear to have any blood or bodily material inside the muzzle or on the gun at all." Defense counsel objected that the hypothetical assumed facts not in evidence, which was

also overruled.  The prosecutor continued:  "And so then suppose that a small amount of blood or bodily material was found on a jacket that was presumed to be in the direction of the back spatter, that is, where the gun was when it was fired, a small amount -- one, two, or three small splotches of blood -- can you tell anything about, about how far that individual was standing from [Michael] when the shot was fired?"  Dr. Resk answered: "I would be able to conclude from that, with that hypothetical, that the person -- or the jacket, assuming that it was on a person, that the jacket was in the proximity of the, of the victim, of [Michael].  And as far as being within one [foot], five feet would depend on what the pattern of the back spatter was, how much spatter was around in front of the decedent, once we could establish how the decedent was most likely standing, sitting, laying down, whatever."  The prosecutor then asked the following clarifying question: "But, in general, what would be the range, if there's no blood on the rifle and a small amount on the jacket, what would be the outside parameters of the distance that you would, you know, find?"  Defense counsel objected that the question called for an answer outside the scope of the doctor's expertise, which was overruled.  Dr. Resk answered: "It's been my experience that with high velocity weapons we could be looking upwards of five feet."

Later, the prosecutor asked Dr. Resk about the bullet hole in the bedroom window, specifically, whether he could "tell anything at all from the beveling of that hole."  After another beyond the scope objection was overruled, Dr. Resk answered, the "external beveling" of the hole indicated the bullet "came from inside the house rather than from outside the house."  This answer prompted another beyond the scope objection that was also overruled.  Then, after eliciting testimony that the height of the hole in the window was "about five feet," the prosecutor asked:  "And so does that indicate to you anything about the path that the bullet followed to get there?"  Another beyond the scope objection was overruled.  Dr. Resk answered:  "The path would have been essentially a fairly

22

straight trajectory rather than at an angle . . . . But it would have been essentially at about the same height. I would have expected the muzzle of the weapon that caused this to be at about the same height, about five feet or so."

A final beyond the scope objection was made to the following question: "And so were you able to make some sort of an estimate about the trajectory of the bullet?" After the objection was overruled, the prosecutor clarified the question: "All things considered, including the location and the height of the hole at the window, do you have an estimate about what sort of trajectory that bullet followed?" Dr. Resk answered: "Based on my experience, training, and observation at the scene, as well as the autopsy, it's my opinion that [Michael] was standing -- as opposed to being crouched or laying on the ground -- he was standing essentially at normal height. The person holding the rifle would have also been standing at essentially normal height; would have been an adult rather than a, you know, a child, a six-year-old child playing with a gun or something like that. [¶] Because of the trajectory, [Michael] was shot on the right side of his eye. The bullet passed through his skull, having essentially exploded his skull, and continued its passage through the room in which [Michael] found himself, and then passed through the window that we've already looked at pictures of."

**B.**

*Analysis*

Defendant argues the blood spatter and trajectory testimony offered by Dr. Resk was outside the scope of his expertise as a forensic pathologist. He further argues the hypothetical question asked by the prosecutor improperly assumed facts not in evidence. We need not decide whether defendant is correct because any assumed error was manifestly harmless.

As we have previously explained, while circumstantial in nature, the case against defendant was very strong. We decline to repeat each of the circumstances that together

23

proved beyond a reasonable doubt defendant shot his father with the rifle. We do specifically address defendant's contention the jury might not have found premeditation and deliberation without the foregoing challenged testimony concerning the distance back spatter might have traveled to reach defendant's jacket and the likely trajectory of the bullet. The back spatter testimony established defendant could have been as far away as five feet when he shot Michael. The trajectory testimony based on the hole in the window established the shot was fired at a horizontal trajectory. Together, defendant argues, this evidence allowed the jury to "infer premeditation and deliberation and reject the defense theories of accident or recklessness."

However, even if Dr. Resk lacked expertise in blood spatter and ballistic trajectory analyses, there is no dispute he possessed expertise in wound analysis. Based on the condition of the skin around the entrance wound, and without objection, Dr. Resk testified the end of the rifle's barrel was no closer than "a foot and a half" away from Michael when the fatal shot was fired. Also based on the condition of the entrance wound, and again without objection, Dr. Resk testified the shot was fired "straight on," as opposed to at an angle. Moreover, the jury heard from another witness, also without objection, the window had a bullet hole at a height of "5 foot 3 inches," and the bullet came from inside the room and exited outside. Based on this evidence, even without the challenged testimony, we have no doubt the jury would have concluded the bullet traveled in a horizontal trajectory, passing through Michael's skull, and exited through the window. We further conclude Dr. Resk's unchallenged testimony that the end of the rifle barrel was no closer than "a foot and a half" away from Michael when the shot was fired was more important to the jury's assessment of premeditation and deliberation than was his challenged testimony defendant might have been as far away as five feet. This is because even if defendant was that shorter distance away, he was still too far away for the rifle to have discharged accidentally in a struggle for the weapon. Finally, other

24

circumstantial evidence also supported the jury's premeditation and deliberation conclusion, specifically, the fact defendant and Michael were arguing when the fatal shot was fired and defendant's incriminating behavior following the murder.

Simply put, even if the challenged evidence was improperly admitted, there is no reasonable probability of a more favorable result without the evidence.

V

*Cumulative Prejudice*

Finally, having concluded the error in admitting hearsay statements from Sarah was harmless beyond a reasonable doubt, and assuming error in the admission of Dr. Resk's blood spatter and trajectory testimony, concluded such assumed error was also harmless, we further conclude the cumulative effect of these actual and assumed errors does not require reversal.

DISPOSITION

The judgment is affirmed.

_____/s/_____
HOCH, J.

We concur:

_____/s/_____
RAYE, P. J.

_____/s/_____
MURRAY, J.

25